1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BETH MAXWELL STRATTON, CHAPTER 7 BANKRUPTCY TRUSTEE FOR THE SGP BENEFIT PLAN, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**GLACIER INSURANCE ADMINISTRATORS, INC.; GLACIER INSURANCE ENTERPRISE, INC.; FRESNO AGENT SERVICE TEAM, INC DOING BUSINESS AS BEN MAR SERVICES; LAWRENCE THOMPSON; BRAD STARK; PIERRE TADA; NORMA SPALDING; DICK NEECE, SR; WILLIAM WOLHAUPTER; AND DOES 1 THROUGH 250, INCLUSIVE,**<br><br>**Defendants.** | **1:02-CV-06213 OWW DLB**<br><br>**MEMORANDUM DECISION AND ORDER RE APPROVAL OF CLASS SETTLEMENT AGREEMENT AND NOTICE; GRANTING PERMANENT INJUNCTION AGAINST FUTURE CLAIMS; ATTORNEYS FEES** |

### 1.   INTRODUCTION

A hearing on the approval of case settlement agreement and related relief was held on September 18, 2006 and continued to November 22, 2006.  Plaintiff, Beth Maxwell Stratton ("Stratton") has made a motion for (1) approval of the settlement agreement with all Defendants; (2) approval of proposed distribution of settlement funds; (3) permanent injunction against future claims or litigation; (4) approval of the bankruptcy trustee's final report of administration.  Stratton brings this motion as a Chapter 7 Bankruptcy Trustee of the SGP Benefit Plan, Inc., and

as the court-appointed independent fiduciary for the SGP Benefit Plan ("The Plan"), and the SGP Benefit Trust("The Trust" or, collectively, "SGP/P/T".)   The proposed Settlement Agreement resolves a dispute between the Plaintiff and Defendants Glacier Insurance Administrators, Inc. ("Glacier"), Former Officers and Trustees of SGP/P/T[1] ("Former Trustee Defendants"), and Sunkist.[2] Objections to the settlement agreement were filed by six parties who each seek a payment of their claims against SGP/P/T.[3]   Since the September 18, 2006 hearing, these objections have been resolved.

## 2. **PROCEDURAL HISTORY**

The initial complaint in this action was filed on October 1, 2002.  (Doc. 1, Complaint.)  The complaint was amended on October 28, 2002.  (Doc. 8, Amended Complaint ("FAC").)  On May 28, 2003 Stratton was appointed as Trustee and Independent Fiduciary of SGP/P/T.  (Doc. 46, Stipulation and Order Appointing Plaintiff, Chapter 7 Bankruptcy Trustee, Beth Maxwell Stratton as Independent Fiduciary and Trustee.)  Stratton requested a preliminary court approval of proposed settlements between the

---

[1] At times relevant hereto those officers and/or trustees consisted of defendants Brad Stark, Pierre Tada, Norma Spalding, Dick Neece, Sr., and William Wolhaupter, as well as Sunkist employee Ted Jones.

[2] Stratton has dismissed Sunkist and Defendant Jones from the action without prejudice to Stratton's right to re-file if the settlement is not consummated.  (Doc. 121, Motion for Final Court Approval, Filed July 11, 2006.)

[3] The opposing parties were David Stark, Tenet Health Systems Hospitals, Yuma Unified Medical Associates, David Cruikshank, DaVita, Inc., and Kaweah Delta District Hospital.

2

1  parties to the litigation and of the notice to the claimants, as

2  well as a temporary stay and injunction of all litigation

3  connected with the SGP/P/T bankruptcy.  (Doc. 81, Mot. for

4  Preliminary Court Approval of Proposed Settlements and of Notice

5  to Claimants, Filed August 4, 2004.)  The motion was granted on

6  October 14, 2004.  (Doc. 92, Order for Preliminary Court Approval

7  of Proposed Settlements and of Notice to Claimants by Plaintiff.)

8  As a result the parties were enjoined from proceeding in related

9  state court litigation until a final judgment was entered in this

10 federal case.

11      On July 11, 2006 Stratton requested final court approval of

12 the settlement agreement, notice to claimants, and a permanent

13 injunction against any future litigation.  (Doc. 121, Mot. for

14 Final Court Approval.)  Stratton then filed an addendum to her

15 motion on August 18, 2006.  (Doc. 130, Mot. for Final Court

16 Approval, ERRATA to Memorandum of Points and Authorities, Filed

17 August 18, 2006.)  A hearing on this motion was held on September

18 18, 2006 and continued to November 22, 2006.

19      On November 17, 2006 Stratton filed a Second set of Proposed

20 Findings of Fact and Conclusions of Law.  (Doc. 170, Second

21 Proposed Findings of Fact and Conclusions of Law.)  Stratton also

22 filed a proposed order.  (Doc. 171, Proposed Order, Filed

23 November 17, 2006.)

24 //

25 //

26

27

28

**3**

1

## 3.   **FACTUAL BACKGROUND**[4]

2

### A.   The Plan

3    SGP was created in August 1990 as a California non-profit

4  mutual benefit corporation for the purpose of administering a

5  voluntary employees benefit association.  The Plan, also referred

6  to at time as the Trust, is an employee welfare benefit plan

7  under ERISA § 1002(1)(A).  It was designed to be a multiple

8  employer welfare arrangement in accordance with ERISA for the

9  purpose of providing medical, surgical, and/or hospital care

10  benefits to members and affiliates of Sunkist Growers, Inc.

11  ("Sunkist").  SGP was the designated plan sponsor.

12    Glacier Insurance Enterprises, Inc. ("Glacier") and its

13  president and chief executive officer, Larry Thompson, acted as

14  administrators and consultants of the Plan throughout its

15  existence.  Glacier was responsible for reporting to the officers

16  of SGP/P/T.

17    Sunkist was an original promoter of the Plan and is alleged

18  to have been a fiduciary and party in interest with respect to

19  the Plan within the meaning of ERISA.  29 U.S.C. §1002(21); 29

20  U.S.C. §1002(14).  Sunkist members and officers including some of

21  the former Trustee Defendants and Ted Jones, were also officers

22  of SGP and/or trustees of the Plan and Trust.  Sunkist endorsed

23  and actively participated in promotion of the Plan and provided

24  certain assurances regarding Plan financing.

25    The Plan did well and operated without a loss throughout its

26

27    [4] Unless otherwise noted, the factual background is taken
entirely from Plaintiff's Motion for Final Court Approval.  (Doc.
28  121, Mot. for Final Court Approval.)

**4**

first years of existence.  However, the Plan began to show significant losses by 1999.  For its fiscal year ending September 30, 1999, it had a $240,000 loss after accounting for funds in reserve.  By fiscal year end September 30, 2000, the annual losses had increased to $3.5 million.

The California Department of Insurance investigated the Plan and directed that it stop accepting new insureds in July 2001.  The Plan ceased operation in October of 2001.  The United States Department of Labor ("DOL") conducted an exhaustive investigation into the history and demise of SGP/P/T and determined that there was possibly as much as $10 million in medical claims against the Plan outstanding and unpaid as of the end of 2001.  No claims have been paid since the Plan ceased operation in October 2001.  The plan is without assets and there are no funds to pay claims except as may be produced through this litigation.  Medical providers began to seek payment of their claims directly from their patients and/or their employers.

On February 25, 2002, SGP, Inc. filed for protection under Chapter 7 of the United States Bankruptcy Code.  Stratton became the duly qualified, appointed and acting Chapter 7 Bankruptcy Trustee of SGP.  The bankruptcy case was removed to the district court.  On May 28, 2003 the court appointed Stratton as an independent fiduciary of the Plan and Trust in place of Former Trustee Defendants.

**B.   Stratton Litigation**

On October 1, 2002 Stratton initiated litigation to recover SGP/P/T's losses from Sunkist, Glacier, and the Former Trustee Defendants alleging, in essence, each of the defendants had

**5**

1  breached fiduciary duties owed to SGP/P/T.  Stratton alleged

2  causes of action for breach of fiduciary duties imposed by ERISA,

3  misrepresentation, breach of contract, negligence, and engaging

4  in prohibited transactions.

5         **C.**    **Department of Labor Investigation**

6       Prior to the initiation of this litigation, the ("DOL") had

7  conducted an exhaustive investigation into the management,

8  operation, finances, and bankruptcy of the Plan.  This

9  investigation included 570 hours of work, an inspection of

10 approximately 400 banker boxes of Glacier and Plan documents.

11 Approximately 1,600 key documents were identified that provided

12 information as to the cause of SGP's and the Plan's collapse and

13 as to the identity of those potentially responsible for the

14 collapse.  The DOL also interviewed twelve different individuals

15 deemed most knowledgeable about the operation and downfall of the

16 Plan.  These included interviews of Former Trustee Defendants and

17 a two-day interview of Larry Thompson.

18      The DOL shared with Stratton and her counsel the results of

19 its investigation.  The DOL gave Stratton copies of key documents

20 and shared the substance of personal interviews and the

21 observations and conclusions drawn therefrom.  Stratton and her

22 counsel reviewed and analyzed this evidence and conferred with

23 DOL representatives and counsel regarding the facts, issues, and

24 evidence in this case in an effort to reasonably identify those

25 individuals and entities with apparent liability and those

26 without.  As a result, Stratton was able to avoid duplication and

27 to minimize the cost of conducting an extensive and time

28 consuming formal discovery to arrive at proposed settlements in

this litigation.

**D.   Mediation and Proposed Settlements**

Stratton argues that the proposed settlements are in the best interest of all the parties involved.  The Settlement Funds from all Defendants will result in a distribution of approximately $0.78 to $0.83 on the dollar for allowed claims against an ERISA plan which otherwise might remain bankrupt, pay nothing, and leave participants and beneficiaries to respond personally to the full amount of claims and/or suits of medical providers.  However, the proposed settlements are contingent upon court approval and a finding that the agreements settle, release, and foreclose all claims of SGP/P/T, Plan participants and beneficiaries, and other potential joint tortfeasors or co-obligors against the settling Defendants.  Absent settlement the litigants may incur substantial additional legal fees and costs, while postponing resolution of outstanding claims for years, all without certainty of recovering more than the proposed settlement amounts or potentially any amount, whatsoever.

**1.   Sunkist**

**a.   The Settlement Agreement**

The first formal mediation session was convened in Fresno, CA on October 14, 2002.  It was presided over by John J. McCauley, a formal civil litigator and a trained, certified, independent, full-time mediator.  The mediation was attended by the following parties: (1) Stratton and her counsel, (2) trial counsel for the Office of the Solicitor, United States DOL; (3) Larry Thompson, represented by trial counsel and insurance coverage counsel on behalf of Glacier, (4) Sunkist and Jones

**7**

through Sunkist's Vice President for Corporate Relations and
General Counsel as well as outside trial counsel.

Stratton claims that negotiations with Glacier at that time
were not productive.  Negotiations with Sunkist were productive.
The negotiations took most of the day and continued via telephone
throughout the following week.  On October 21, 2002, with the
mediator's assistance, Stratton and Sunkist reached a mutually-
acceptable framework for settlement.  For seven months, Stratton
and her counsel negotiated details of the understanding with
Sunkist and reduced to a written Settlement Agreement and Mutual
Release which was signed on June 26, 2003.  (Doc. 121, Stratton
Decl., Ex. A.)  The agreement provides for resolution of all
Stratton's claims against Sunkist and Jones in return for Sunkist
promise to pay into the Plan a base sum of $2.5 million to be
adjusted up or down depending upon total Plan claims ultimately
paid and amounts collected from other defendants.  Sunkist
deposited the full $2.5 million into an escrow account and
through subsequent agreements, released portions of it to pay for
the expenses of claims administration.

### b.    The Likelihood of Success in Litigation

Stratton believes that she has a better than 60% chance of
prevailing against Sunkist and Jones.  However, Sunkist's counsel
disputes Sunkists' and Jones' liability for the Plan's losses.
Stratton claims that Sunkist directors controlled the Plan and
manipulated it to Sunkist's advantage.  If successful, this claim
could produce a recovery of more than Sunkist has offered.
However, absent evidence that Sunkist had a formal fiduciary
position in the Plan, Stratton likely would have to prove acts of

**8**

active malfeasance by Sunkist.  Sunkist insists there is no
evidence to support such a claim.

Sunkist argues that Stratton's claims arise from the
following three facts: (1) Three of the five trustees of the Plan
also sat on Sunkist's board of directors, (2) In November 1996,
Sunkist's board of directors committed Sunkist to contribute
capital to enable the Plan to meet its $1 million excess reserve
requirements under 1994 legislation, and (3) In November 1996,
Sunkist renewed a trademark licensing agreement with the Plan in
return for a 1% royalty.

Sunkist maintains that even if Stratton established that
Sunkist was obligated to honor a capital contribution commitment
an/or that the trademark license was a prohibited transaction
under ERISA, she would recover much less than Sunkist's proposed
settlement.  Sunkist asserts that its capital contribution
obligation was capped at the $1 million statutorily required for
excess reserves and that only the $258,581 Sunkist received as
licensing fees could be recovered if the licensing agreement were
to be a prohibiting transaction.  Sunkist contests liability on
both claims and forcefully asserts factual and legal defenses to
both.

Sunkist also maintains, and Stratton acknowledges for the
purposes of this motion, that Sunkist's role in the operation of
the SGP Plan was more tangential than that of named defendants.
Although Sunkist organized the SGP Plan in 1990 as a benefit for
employees of its member-growers and affiliated citrus packing
houses, Sunkist employees were not eligible to participate in it,
and Sunkist denies it ever managed the Plan.

**9**

1    Sunkist further argues that its corporate structure actually

2   negates inference of control.  Sunkist is a non-profit federated

3   marketing cooperative whose directors are grower-member

4   representatives selected by grower-members.  Sunkist has no

5   inside directors.  Most directors were principals and prominent

6   employees of citrus growing and packing businesses which marketed

7   fruit through Sunkist.  These citrus business are financially

8   independent of Sunkist and one another, have their own employees,

9   and, in fact, compete with one another.

10    A number of these citrus businesses also were participants

11   in the SGP plan.  The Sunkist-related SGP Trust trustees were

12   high ranking employees or principals of the other businesses

13   participating in the SGP Plan, not employees of Sunkist.  Some

14   were Directors of Sunkist as well as Trustees of the SGP Trust.

15   (Doc. 130, Mot. for Final Court Approval, ERRATA to Memorandum of

16   Points and Authorities, Filed August 18, 2006.)  As a result,

17   Sunkist maintains that the allegiance of these trustees was to

18   their own businesses, not to Sunkist.  Moreover, claims dependant

19   on an "inferred" overlap may call for affirmative evidence that

20   Sunkist actually directed the activities of the Plan for its own

21   benefit.  Stratton has not yet identified such evidence.  The

22   Plan and its day to day activities were run by Defendant Lawrence

23   Thompson and Glacier who reported to the Plan trustees.

### c.    Sunkist's Good Faith Efforts To Reach Settlement

25

26    Stratton claims that Sunkist has been cooperative in

settlement negotiations from the beginning.  This cooperation

27

has, to a significant degree, made settlement of the entire case

28

**10**

1  possible.  Sunkist was the very first party to actively

2  participate in settlement negotiations with Stratton and the

3  first to settle.  For example, very early in the process it

4  agreed to provide the Plan with a guaranteed fund of $2.5

5  million.  This guarantee facilitates Stratton's efforts to pursue

6  and negotiate settlements with the other defendants.

7  Additionally, when Stratton needed funds to identify claimants

8  and administer the claims, Sunkist agreed to advance in excess of

9  $200,000 of its settlement funds for that purpose even before the

10  proposed settlement was approved.

11                    **2.    Former Trustee Defendants**

12                    **a.    The Settlement Agreement**

13      Stratton and the Former Trustee Defendants engaged in

14  extensive settlement negotiations designed to resolve the case

15  without depleting insurance funds available for settlement.  On

16  August 11, 2004 Stratton entered into a written settlement

17  agreement with the Former Trustee Defendants.  (Doc. 121,

18  Stratton Decl., Ex. B.)  Former Trustee Defendants' insurer

19  agreed to contribute $1 million, to settle the case.  This

20  agreement is contingent upon the court approving the settlement

21  and barring all future litigation against the Former Trustee

22  Defendants.

23      Stratton, with the concurrence of the DOL, has concluded

24  that immediately obtaining a $1 million settlement from Former

25  Trustee Defendants, without risk or significant additional cost

26  to the Plan, is the most prudent course of action and in the best

27  interest of the Plan participants and beneficiaries.

28  //

1

**b.     The Trustee Defendants' Insurance Policies**

2     Stratton's formal discovery revealed that the Former Trustee

3  Defendants, as a group, have two insurance policies that could

4  provide insurance coverage in this action: an "Executive

5  Protection Policy" and a "Directors and Officers Liability

6  Policy," both issued by the Chubb Group of Insurance Companies

7  and its parent, Federal Insurance Company.  The limit of each

8  policy is $1 million.

9     Chubb asserts that only the "Executive Protection Policy"

10  has any potential to provide indemnity for the claims and it

11  claims that indemnity obligation is limited to state common law

12  claim which are preempted by ERISA.  Also both policies are

13  "burning limits" policies, meaning that every dollar spent on the

14  defense of this case reduces the amount of coverage available for

15  indemnification or contribution towards settlement.  More than

16  $300,000 has already been expended from the policies on legal

17  fees.

18     After the Former Trustee Defendants tendered Stratton's

19  claims to Chubb, the insurer issued a formal coverage opinion to

20  the effect that while both insurance policies cover costs of

21  defense, the "Directors and Officers" policy does not provide

22  indemnity coverage for the claims in this case.  Consequently,

23  the maximum amount of insurance coverage the Former Trustee

24  Defendants have to contribute to the settlement in this action is

25  $1 million.

26

**c.     The Likelihood of Success in Litigation**

27     Stratton believes that she has a better than 60% chance of

28  prevailing against the Trustee Defendants.  Although Stratton is

**12**

1  confident in her claims against the Former Trustee Defendants,
2  she recognizes there is risk she may not prevail in litigation
3  against them.   Stratton claims that the Former Trustee Defendants
4  vigorously deny liability.   They contend that they properly and
5  prudently relied upon information and reports from professional
6  service providers, including Glacier defendants, and they assert
7  legal defenses based on ERISA preemption of Stratton's claims and
8  other grounds.

9       Also, pursing litigation through trial would likely exhaust
10 all insurance funds otherwise available to satisfy a judgment.
11 Considering the defenses the Former Trustee Defendants have
12 asserted and the large number of consultants and trial experts
13 required to take this case through trial, the Former Trustee
14 Defendants' cost of defense has been credibly estimated to exceed
15 $2 million.   Thus, after litigation, there would be no insurance
16 proceeds left after trial to satisfy a judgment.

17      Lastly, Stratton believes that the Former Trustee Defendants
18 and their insurer will likely resist any attempt by Stratton to
19 seek a judgment over and above insurance coverage limits and then
20 must attempt to satisfy it directly from the personal assets of
21 one or more of the trustees.   According to Stratton, any such
22 attempt would also be costly, time consuming, and potentially
23 unproductive as it would dissipate otherwise available insurance
24 funds.   To the extent the Former Trustee Defendants have assets,
25 they are encumbered and/or protected by exemptions.   Pursuit of
26 such litigation would also demand funds to cover Stratton's
27 consultants, experts, and other litigation expenses.   SGP has no
28 such funds.

**13**

**3.   Glacier Defendants**

**a.   The Settlement Agreement**

On December 17, 2003, Stratton and the Glacier Defendants underwent mediation presided over by retired Federal District Court Judge, Layn R. Phillips,[5] who is now a full time professional mediator and manager of Irell & Manella's Alternative Dispute Resolution Center in Newport Beach, CA.   The following parties were in attendance: (1) Stratton and her counsel, (2) Larry Thompson, (3) Glacier litigation counsel, (4) Glacier insurance coverage counsel, (5) General Star's Vice President of Claims, (6) General Star's counsel, (7) and the United States DOL through its counsel from the Office of the Solicitor and its Senior Investigator.

After eleven hours of analyzing, evaluating, debating, and attempting to compromise the competing claims, General Star agreed to pay Stratton $2 million in settlement of Stratton's claims against all Glacier defendants subject to court approval of the settlement terms.   The parties spent the next several months negotiating the details of the proposed settlement and reducing them to the written settlement agreement and release dated August 10, 2004.   (Doc. 121, Stratton Decl., Ex. C.) General Star expressly conditioned its willingness to pay the $2 million on obtaining judicial assurances that it and Glacier would not have to risk being exposed to further claims or demands from other parties or claimants in connection with SGP or the

---

[5] Judge Phillips provided a declaration supporting the settlement.   (Doc. 121, Stratton Decl., Ex. E.)

**14**

1  Plan.  Glacier's $2 million has been deposited with the Registry

2  of this Court for payment over to Stratton with interest if the

3  settlements are approved.

**b.   The Glacier Defendants Insurance Policy**

5      Glacier is insured under a $5 million Business Errors and

6  Omissions Liability policy issued by General Star Indemnity

7  Company.  General Star, noting among other things, policy

8  exclusions for claims under ERISA, claims arising out of

9  insolvency of the Plan, and claims for actuarial and underwriting

10  errors, denies that its policy provides any coverage for the

11  claims asserted herein.

12      General Star originally denied it even owed Glacier a duty

13  to defend Stratton's action.  As a result, Glacier was compelled

14  to hire coverage counsel and file suit against General Star

15  claiming that, at a minimum, General Star owed Glacier a defense

16  under the policy.  In response, General Star relented in part and

17  agreed to undertake the defense of these claims against Glacier

18  under a reservation of rights.  General Star's reservation of

19  rights letter asserts several defenses to a claim for indemnity

20  coverage.

21      Also, General Star's policy is a "burning limits" policy,

22  which means that every dollar spent by General Star in defense of

23  these claims reduces the amount of coverage otherwise available

24  to indemnify Glacier against a judgment if one is obtained and if

25  coverage applies.  Defense costs have been projected to exceed $2

26  million given the substantial legal and factual issues to be

27  addressed in litigation and the number of consultants and trial

28  experts needed for the process.  Absent settlement, SGP/P/T has

**15**

no means of paying such litigation expenses.

### c.   The Likelihood of Success in Litigation

Stratton estimates that she has a better than 75% chance of prevailing in litigation against the Glacier Defendants. However, Glacier intends to raise and vigorously litigate factual and legal defenses against Stratton if the settlement is not approved.  Glacier's litigation counsel drafted a five page memorandum outlining contentions Glacier will make and issues it will raise if the case proceeds.  (Doc. 121, Stratton Decl., Ex. C.)  Stratton disputes the claims made by Glacier.  Further, Stratton argues that Glacier raises a number of potentially complex issues Stratton will be forced to litigate if the settlement is not approved.

Stratton believes that this proposed settlement with the Glacier Defendants is in the best interest of SGP/P/T.  These reasons include (1) concern over the potential viability of insurance coverage issues raised by General Star, (2) Stratton's inability to identify through extensive investigation any substantial unencumbered assets in the name of any of the Glacier Defendants, including Larry Thompson which would be available to execution at the time a judgment was eventually obtained, (3) the belief based upon comments from Judge Phillips, that General Star would not pay more in settlement without litigation, (4) and the belief that, absent settlement, the cost of hiring experts and litigating the multiple complex claims and defenses could well exceed $2 million for each side so that even if Stratton prevailed at trial, the net recovery to the Plan could be less than that produced by a $2 million settlement at this time.

**16**

1

**D.    Preliminary Court Approval**

2   On October 14, 2004, the Court issued an Order preliminarily

3   approving the settlement agreements and temporarily enjoining all

4   within the Court's jurisdiction whose rights had been affected by

5   the SGP Plan's bankruptcy from pursuing or commencing any

6   litigation against the SGP Trustee, SGP Plan, Defendants in this

7   case, SGP Plan employers, and SGP Plan beneficiaries and

8   participants to collect amounts claimed due from the operation of

9   the SGP Plan.  Thereafter, on December 21, 2004, by stipulation

10  of the parties, the Court issued a further order extending the

11  above protections to Sunkist and Jones and approving Stratton's

12  proposed Notice advising identifiable claimants of the

13  proceedings, the temporary injunctive relief, and the need for

14  each claimant to submit a Proof of Claim in a form which was also

15  approved by the Court.

16  **E.    Claims Administration**

17  Stratton then, with the assistance of HealthComp Third Party

18  Administrators,[6] a licensed and experienced third party claims

19  administrator for self insured health benefit plans, caused the

20  Court-approved notice and Proof of Claim form to be mailed

21          (1)   to the most currently determinable

22                addresses of all post-1999 employer

23                group participants in the Plan

24          (2)   all individuals and entities active in

25  ────────────────

26  [6] The Declaration of Phillip Musson, President of
    HealthComp, outlines HealthComp's qualifications in detail and
27  provides a detailed description of the procedures followed by
    HealthComp in identifying and notifying potential claimants,  and
28  administering claims they submitted against the Plan.

**17**

1          the Plan after 1999

2     (3)   all medical providers who had a Plan

3          claim processed after 1999,

4     (4)   and all individuals and entities who

5          filed claims against SGP in the

6          bankruptcy action.

7     As a result of these efforts, claims for payment of more

8 than 10,000 medical services billings were identified.  Stratton

9 asserts that each and every claim was recorded, tracked, and

10 evaluated by HealthComp professional in accordance with Plan

11 provisions and professional standards.  As a result, Stratton

12 was able to determine whether, and the extent to which, each

13 claim was covered by SGP Plan, whether the claimant was eligible

14 for coverage, and the precise amount covered and owed under the

15 Plan after application of deductibles, co-pays, co-insurance,

16 coverage maximums, exclusions, PPO discounts, and other Plan

17 limitations.

18     Further, because of the several successive efforts to get

19 actual notice to all potential claimants, and the time needed to

20 evaluate and determine the covered amount of each claim under

21 the SGP Plan, HealthComp's claim administration continued

22 through approximately November 2005.  Through the process,

23 HealthComp professionals have determined that there is a total

24 of $4,284,073.91 owing from the Plan on valid, timely, and

25 unpaid claims.  Though less than the amount originally estimated

26 by DOL representatives, the total of allowed claims is

27 consistent with what HealthComp professionals expected given

28 that notices were sent to every person or business which had

1  done business with SGP or the Plan in 2000 and 2001.

2      **F.**   **Proposed Settlement and Distribution**

3      Stratton's plan for distribution of the settlement proceeds

4  is as follows:

5  (1)  <u>Settlement Payments</u>

6      a.   From Sunkist                     $2,027,376

7      b.   From Trustee Defendants        $1,000,000[7]

8      c.   Glacier Defendants             $2,000,000

9                        Total             $5,027,376

10

11  (2)  <u>Costs and Expenses</u>[8]

12      a.   Bankruptcy Trustee/Independent Fiduciary   $105,000

13      b.   ERISA Consultant                  $53,800

14      c.   Litigation Counsel             $860,000

15      d.   Accountants                   $17,600

16      e.   Other Administrative Professionals     $7,900

17

18

19     [7] The settlement payments from both the Trustee Defendants and the Glacier Defendants will be somewhat higher due to the accumulation of interest.

20

21     [8] These itemized costs include costs and expenses incurred
22  to date and projected future costs and expenses Stratton believes necessary to complete administration of the Plan and close the SGP/P/T estate.  As stated in her Declaration, Stratton has used
23  her best efforts to project accurately those future costs and expenses, but as with any projection, hers may prove deficient or
24  excessive. If excessive by at least $20,000, Stratton proposes that the excess be distributed pro rata to each claimant.  If the
25  excess, if any, is less than $20,000 a second distribution likely would yield only pennies to most claimants.  Stratton proposes
26  that anything less than $20,000 be deposited into the State of California Unclaimed Property Fund for disbursement in accordance
27  with Code of Civil Procedure section 1300, et seq., as provided
28  in the Settlement Agreements.

f.   HealthComp, Inc. Claims Administrators        $298,000

g.   Miscellaneous Other Administrative Expenses  $110,000

Total                      $1,452,300


(3)   Approximate Balance for Distribution to Claimants

Total                      $3,575,076[9]

Stratton claims that this proposed recovery for claimants is multiple times greater than typically produced even in most "asset" bankruptcy cases.  Stratton proposes the following procedure for actual release and distribution of the settlement funds:

(1)   If this motion is granted and a Final Order and Judgment entered thereon and the time for appealing expires or an appeal is filed but results in final affirmation of this Court's order and judgment, Stratton shall at that time petition this Court for release of the settlement funds from Sunkist and from the Court's Registry to her in trust for payment of SGP/P/T expenses and claims pursuant to the above-described and Court-approved plan of distribution.

(2)   If an appeal is filed and an appellate court overrules this Court's entry of the Final Judgement and Order or remands the action to the Court for reconsideration and the remand order directs or effects a material change to the terms of a settlement with a settling

---

[9] This amount is approximate.  The final amount will change due to accrued interest and possible adjustment of administrative expense.  Presently, this represents $0.83 for every dollar.

20

party, the Court shall, by agreement of Stratton and
the settling parties, release the settlement funds
from the Registry of the Court and return them to the
settling parties and the Settlement Agreements will be
deemed void ab initio and have no effect.

(3)    If and after this Court's Judgment and Order become
final and all prerequisites and conditions of
settlement have been satisfied and Stratton has paid
Plan costs and expenses, distributed the settlement
funds to the claimants, and deposited all
undistributed funds into the California Unclaimed
Property Fund in accordance with California Code of
Civil Procedure section 1300, et seq., Stratton shall
report to the Court and all parties to this action
that she has completed the distribution and seek to
obtain this Court's order terminating the Plan and
Trust discharging SGP and Stratton.

**G.    Opposition to Settlement and Distribution**

No objections to the substantive relief sought have
been filed.  (Doc. 150, Stratton Reply and Reply Summary to All
Objections, Filed September 11, 2006.)  The only objections are
by claimants who objected to the way that their particular
claims are treated under the proposed plan of distribution.
(*Id.*)  Since the September 18, 2006 hearing, those objections
have been resolved.  (Doc. 170, Second Proposed Findings of Fact
and Conclusions of Law, Filed November 17, 2006.)

**H.    Relief Requested**

Stratton seeks an order from this Court for the following:

21

(1)   Approving Stratton's settlement
agreements with Sunkist Growers, Inc.
And Ted Jones, the Glacier Defendants,
and the Former Trustee Defendants.

(2)   Permanently barring and enjoining the
following from initiating or pursuing
any claims or actions against SGP/P/T or
the Settling parties relating in any way
to SGP/P/T including claims or actions
relating to the creation, operation,
management, administration, marketing or
failure of SGP, the Plan, or the Trust;
the payment or non payment of benefits
or claims for services; or any promise
representation, contract, or other
activity relating to SGP, the Plan, or
the Trust:

(a) all claimants, creditors,
participants, and beneficiaries of
SGP/P/T,

(b) recipients of settlement funds,
and others including those who
filed bankruptcy claims or Proofs
of Claims in this action and all
who received Stratton's notice of
this motion and the opportunity to
be heard at the hearing on this
motion.

**22**

(3)   Finding that all persons or entities who
      accept a check from Stratton pursuant to
      her Distribution Plan are, by endorsing,
      cashing, or otherwise negotiating that
      check agreeing to and will be bound by
      the terms of the settlement agreement.

(4)   Approving payment of fees and
      reimbursement of expenses to
      administrative and other professionals

(5)   Approving the proposed Distribution Plan

(6)   Approving the Bankruptcy Trustee's Final
      Report of Administration and

(7)   Retaining jurisdiction of this case to
      ensure the settlements are carried out.

### 4.   **STANDARD OF REVIEW**

"The court must approve any settlement...of the claims...of a certified class."  Fed. R. Civ. P. 23(e)(1)(A).  The court may approve a settlement only after a hearing and on finding that it is fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e)(1)(C). Such approval is required to make sure that any settlement reached is consistent with plaintiffs' fiduciary obligations to the class. *See, Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985).  The court also serves as guardian for the absent class members who will be bound by the settlement, and therefore must independently determine the fairness of any settlement. *Id.*  However, the district court's role in intruding upon what is otherwise a private consensual agreement is limited to the extent necessary to reach a reasoned judgment

**23**

that the agreement is not the product of fraud or collusion between the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable, and adequate to all concerned. *FDIC v. Alshuler (In re Imperial Corp. of Am.)*, 92 F.3d 1503, 1506 (9th Cir. 1996).  Therefore, the settlement hearing is not to be turned into a trial or rehearsal for trial on the merits. *Officers for Justice v. Civil Service Com.*, 688 F.2d 615, 625 (9th Cir. 1982).[10]  Ultimately, the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations, and rough justice.  *Id.*

    In determining whether a settlement agreement is fair, adequate, and reasonable to all concerned, a district court may consider some or all of the following factors: (1) the strength of the Plaintiff's case (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed; (6) the stage of the proceedings; (7) the views and experience of counsel; (8) any opposition by class members; (9) the presence of a governmental participant. *Linney v. Cellular Alaska Pshp.*, 151 F.3d 1234,1242 (9th Cir. 1998).  This list of factors is not exclusive and the court may balance and weigh different factors depending on the circumstances of each case.

___

    [10]   It is not the role of the district court to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute.  *Officers for Justice v. Civil Service Com.*, 688 F.2d at 625.  It is the uncertainty of the outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.  *Id.*

*Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).  This necessarily requires the court to make a careful analysis of all the facts and applicable law.  *Montgomery County Real Estate*, 83 F.R.D 305, 316 (MD 1979).  In addition, where the payment of attorneys fees is also part of the negotiated settlement, the fee settlement must be evaluated for fairness in the context of the overall settlement.  *Kinsely v. Network Assocs.,* 312 F.3d 1123, 1126 (9th Cir. 2002).

## 5.  DISCUSSION

### A.    The Merits of the Settlement Agreement

#### 1.    Strength of Stratton's Case and the Expense, Complexity, and Likely Duration of Further Litigation

Stratton believes she has a better than 60% chance of prevailing against both Sunkist and the Former Trustee Defendants in litigation.  As against the Glacier Defendants, Stratton believes she has a greater than 75% change of prevailing in litigation.  However, each of the Defendants dispute and deny liability.

Sunkist argues that Stratton will recover less than the $2,027,376.00 settlement amount Sunkist has agreed to pay.  Sunkist asserts that its capital contribution obligation was capped at the $1 million statutorily required for excess reserves and that only $258,581 could be recovered.  Sunkist also maintains that Stratton will find no evidence to support a claim of active malfeasance by Sunkist in relation to SGP/P/T.  Proof of active malfeasance is required in this case where Sunkist did not have a formal fiduciary position in the Plan.  Sunkist's role in the operation of the SGP Plan was more

1   tangential and Sunkist employees were not eligible to

2   participate in the Plan.  Sunkist denies it ever managed the

3   Plan.  Sunkist further argues that its corporate structure

4   prevents it from exercising control over the Plan as it has no

5   inside Directors.  Most directors were principals and prominent

6   employees of grower-member citrus businesses that are

7   financially independent of Sunkist.  While some of the Sunkist

8   related SGP Trustees were Directors of Sunkist, none were

9   Sunkist employees and Sunkist maintains that their allegiance

10  was to their own businesses, not to Sunkist.  Stratton admits

11  that claims dependant on an "inferred" overlap may call for

12  evidence that Sunkist actually directed the activities of the

13  Plan for the benefit of Sunkist.  Stratton admits that she has

14  not yet identified such evidence.

15      As against the Trustee Defendants, although Stratton is

16  confident in her claims, she also recognizes the risk that she

17  may not prevail against them in litigation.  Former Trustee

18  Defendants deny liability.  They contend that they properly and

19  prudently relied upon information and reports from professional

20  service providers.  Also, Stratton argues that because the

21  insurance policy for the Former Trustee Defendants is a "burning

22  limits" policy, pursuing litigation would likely exhaust all

23  insurance proceeds otherwise available to satisfy judgment.

24  Litigation will necessarily involve a large number of

25  consultants and trial experts.  The cost of trial to final

26  judgment is estimated to exceed $2 million and, after

27  litigation, there would be no insurance proceeds left.  Were

28  Stratton to seek judgment above the insurance coverage limit,

1  her recourse is against the Former Trustee Defendants. The
2  Former Trustee Defendants claim their assets are encumbered or
3  protected by exemptions.

4      Glacier likewise intends to raise and vigorously litigate
5  factual and legal defenses against Stratton if the settlement is
6  not approved.  Glacier submitted a five page memorandum
7  outlining a number of complex issues they intend on raising if
8  the case goes to trial.  Litigation is estimated to delay the
9  resolution of this matter for several years.

10     The cost of pursuing judgment through litigation, the risk
11  of not prevailing, and the delay and difficulty in litigating
12  insurance coverage issues and/or pursuing individual assets in
13  the face of a likely concerted defense effort weighs in favor of
14  settlement among the parties.

15           **2.   Amount Offered in Settlement**
16     The agreement between Sunkist and Stratton provides for a
17  resolution of all claims against Sunkist and Jones in return for
18  Sunkist's payment of a base sum of approximately $2.5 million.
19  Sunkist deposited the full amount into an escrow account and,
20  through subsequent agreements released a portion of it to pay
21  for the expenses of claims administration.

22     In the agreement between Former Trustee Defendants and
23  Stratton, Former Trustee Defendants have agreed to contribute $1
24  million to settle the case.

25     In the agreement between Glacier and Stratton, Glacier has
26  agreed to contribute $ 2 million.  This amount has been
27  deposited with the Registry of this Court for payment over to
28  Stratton with interest if the settlement is approved.

27

The combined settlement agreements yield approximately $5,027,376.00.  Stratton argues that the proposed settlements are in the best interest of all the parties involved.  The Settlement Funds from all Defendants will result in a distribution and payment of approximately $0.78 to $0.83 on the dollar for allowed claims against an ERISA plan which otherwise may remain bankrupt, pay nothing, and leave participants and beneficiaries to respond personally to the full amount of claims and/or suits of medical providers.  However, the proposed settlements are contingent upon court approval and a finding that the agreements settle, release, and foreclose all claims of SGP/P/T, Plan participants and beneficiaries, and other potential joint tortfeasors or co-obligors against the settling Defendants.

### 3.    The Extent of Discovery Completed at this Stage in the Litigation[11]

Stratton argues that she has been able to minimize the cost of conducting extensive and time consuming formal discovery by relying on the investigation conducted by the DOL prior to the initiation of this litigation.  The DOL conducted an investigation into the management, operation, finances, and bankruptcy of the Plan.  This investigation involved 579 hours of work and an inspection of approximately 400 banker boxes of Glacier and Plan documents.  From this investigation Stratton received information as to the cause of SGP's and the Plan's

---

[11] This also satisfies the factor taking into account the presence of a governmental participant since the United States DOL conducted the investigation in this case.

collapse and as to the identity of those potentially responsible for the collapse.  The DOL shared with Stratton and her counsel the results of their investigation and gave Stratton copies of key documents and conclusions.

The only motions filed in this case related to the settlement efforts in this case.  The settlement proposal was not hastily arrived at and is the result of several years of negotiations amongst the settling parties.  No objecting party complained about the inadequacy of discovery.

**4.   The Views and Experience of Counsel**

Stratton is the trustee and the Chapter 7 court appointed independent fiduciary for SGP/P/T.  (Doc. 121-5, Stratton Decl. In Support of Motion, Filed July 11, 2006, ¶ 1.)  She is also a partner with the law firm Seng and Stratton.  (*Id.*)  Stratton has engaged in the investigations, negotiations and settlements, and administrative and other acts related to these settlement agreements since 2002.  Stratton believes that approval of these settlement agreements is in the best interests of all the parties.  Further, this motion is brought with the knowledge and approval of the Secretary of the United States DOL who, although not a party to this litigation, has followed the case closely and authorized Stratton to inform the Court that the DOL has no objections.  (Doc. 121-5, Stratton Decl. In Support of Motion, ¶ 4.)

Further, Judge Layne Phillips who served as the mediator on December 17, 2003, in negotiations between Stratton and the Glacier Defendants also supports the court approval of this settlement.  (Doc. 121-5, Ex. E, Phillips Decl. In Support of

Motion.)  Judge Phillips is a retired Federal District Court
Judge who is now a full time professional mediator and manger of
Irell & Manella's Alternative Dispute Resolution Center in
Newport Beach, CA.  In his 25 years as a private attorney, U.S.
Attorney, Federal Judge and Mediator, Judge Phillips has had
extensive experience with the issues present in this case.
(Doc. 121-5, Ex. E, Phillips Decl. In Support of Motion., ¶ 8.)
Judge Phillips argues that this is "a very very complex case in
which both sides face substantial substantive, procedural, and
insurance coverage issues." (*Id.*, at ¶ 9(a).)  It is likely
that each side will incur a large amount of legal expenses if
settlement is not reached and the case goes on to litigation.
(*Id.*, ¶ 9(b).)  Judge Phillips therefore supports the proposed
settlement and encourages the Court to approve it.  (*Id.*, ¶ 6.)

## 5.   Opposition by Class Members

There were no objections filed to the substantive relief
sought by the parties.  The only objections are by claimants who
object to the way their particular claims are treated under the
proposed plan of distribution.  Since the hearing on September
18, 2006 all objections against the settlement have been
resolved.

After a careful balance of the aforementioned factors,
Stratton's request for approval of the settlement agreement and
distribution plan is **GRANTED**.

## B.   Was the Notice of the Settlement Provided Fair?

Adequate notice is critical to court approval of a class
settlement under Fed. R. Civ. P. 23(e).  *Hanlon v. Chrysler
Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998).  "The best notice

**30**

1  practicable under the circumstances" must be provided to class

2  members.  Fed. R. Civ. P. 23(c)(2)(B).  Notice is satisfactory

3  in the context of settlement if it fairly apprises class members

4  of the terms of the settlement in sufficient detail to afford

5  them the opportunity to decide whether they should accept the

6  benefits offered, opt out and pursue their own remedies, or

7  object to the settlement.  *Churchill Village, L.L.C. v. General*

8  *Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *see also Hanlon*, 150

9  F.3d at 1025.

10     The district court approved the form of notice in this case

11  during the preliminary approval process.  (*See*, Doc. 92, Order

12  RE: Preliminary Approval of Settlement; Approval of Notice to

13  Claimants; and Temporary Injunctive Relief, Filed October 14,

14  2004.)  The Notice presented meets the requisite standards of

15  clarity and conciseness as required by Fed. R. Civ. P. 23.  It

16  explains the nature of the action, the definition of the Class,

17  a brief summary of the Class claims, and that a Class member may

18  enter an appearance through counsel if the member so desires.

19  (*See* Doc. 121, Notice of Motion for Final Court Approval, Filed

20  July 11, 2006.)  The Notice provides Class members with

21  information explaining that there is no "opt-out" procedure in

22  this case.  (*Id.*)  It informs claimants that if they object to

23  any relief sought in the motion, a claimant must file and serve

24  a written objection, giving specific instructions of how to do

25  so.  (*Id.*)  In addition, the Notice explains the binding effect

26  of the Settlement Agreement on Class members, stating that they

27  "will be bound by it, and [] will not be able to bring a

28  separate lawsuit alleging the same or similar claims."  (*Id.*)

**31**

1    In early 2005, Stratton and Musson, determined the scope of

2    the mailing list which would be used for mailing the "claims

3    package" to persons and entities who may have a claim against

4    SGP Benefit Plan.  (Doc. 149-3, Musson Decl. In Reply to Kaweah

5    Objection, Filed September 11, 2006, ¶ 3.)  The claims package

6    included the claim form which was previously approved by the

7    court.  (*Id.*)  The mailing list consisted of approximately

8    30,000 addresses, and was derived from several different

9    sources, including the mailing list of those who had filed

10   claims with the bankruptcy court in the SGP Benefit Plan, Inc.

11   case.  (*Id.*)

12   The claims package was mailed in February 2005.  (*Id.*, ¶

13   4.)  After the mailing, approximately 3,000 returned envelopes

14   were received.  (*Id.*)  The claims administrator then prepared a

15   spreadsheet of the addresses of all the returned envelopes.

16   (*Id.*)  Further, notices of the September 18th hearing on this

17   matter were mailed in July 2006 in both English and Spanish.

18   (*Id.*, ¶ 7.)  The claims administrator received approximately

19   5,142 returned envelopes.  (*Id.*)  The claims administrator

20   conducted a random sampling of 10 of those envelopes to

21   determine whether the notice in them was complete in both

22   English and Spanish.  (*Id.*)  The claim administration staff then

23   conducted a random sampling of 200 additional envelopes and

24   found that three envelopes did not contain a complete copy of

25   both the English and Spanish versions of the notice.  (*Id.*)

26   At the hearing on September 18, 2006 Stratton informed the

27   court that she failed to comply with a provision of the

28   settlement agreement to conduct a reasonable search of

**32**

1  additional addresses for the returned mail.  The hearing was

2  continued to November 22, 2006 to give Stratton an opportunity

3  to attempt to remail returned Notices and report to the parties

4  on her efforts to do so.  At the November 22, 2006 hearing,

5  Stratton informed the court that she remailed the returned

6  notices in compliance with the provision.

7      Notice in this case is found to be fair and reasonable.

8  **C.    Stratton's Request for Permanent Injunction**

9      Even where subject matter jurisdiction is satisfied in the

10 original action, enforcement of a final settlement agreement and

11 order requires its own basis for jurisdiction before the federal

12 court may interpret and apply its own judgment to the future

13 conduct contemplated by the judgment.  *Sandpiper Vill. Condo.*

14 *Ass'n v. Louisiana-Pacific Corp.*, 428 F.3d 831, 841 (9th Cir.

15 2005).  The requisite independent basis for jurisdiction may be

16 supplied by a provision in the settlement agreement and order

17 that expressly retains jurisdiction in the district court for

18 the purpose of overseeing and enforcing prior judgment.  *Id.*

19 Such a provision, in conjunction with the All Writs Act,[12]

20 empowers a district court to protect its judgment from a

21 subsequent action that frustrates the purpose of the settlement

22 agreement and order.  *Id.*  Injunctions under the All Writs Act

23 are not subject to the standards for preliminary injunction

24 under Fed. R. Civ. P. 65.  *In re Baldwin-United Corp.*, 770 F.2d

25

26     [12] The All Writs Act, 28 U.S.C. § 1651(a) provides, "The
   Supreme Court and all courts established by Act of Congress may
27 issue all writs necessary or appropriate in aid of their
   respective jurisdiction and agreeable to the usages and
28 principles of law."

1 328, 330 (2nd Cir. 1985).

2 The All Writs Act is limited by the Anti-Injunction Act.[13]

3 *Sandpiper Vill. Condo. Ass'n.*, 428 F.3d at 841. However, under

4 the Anti-Injunction act a federal court may intervene and enjoin

5 future litigation in three narrow exceptions, one of which

6 includes, when it is necessary, to protect the court's

7 jurisdiction. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025

8 (9th Cir. 1998).

9 In seeking approval for the settlement Stratton has

10 requested that the following be enjoined from initiating or

11 pursuing any claims or actions against SGP/P/T or the Settling

12 parties relating in any way to the instant matter:

13 (1) all claimants, creditors, participants, and

14 beneficiaries of SGP/P/T who are subject to the court's

15 jurisdiction

16 (2) recipients of settlement funds, and others including

17 those who filed bankruptcy claims or Proofs of Claims in

18 this action and all who received Stratton's notice of this

19 motion and the opportunity to be heard at the hearing on

20 this motion.

21 The terms of this settlement agreement requires that all

22 suits against Defendants regarding their action relative to

23 SGP/P/T be permanently enjoined for the agreements to have

24 effect. In dealing with such settlements, the Second Circuit

25

26 [13] The Anti Injunction Act, 28 U.S.C. § 2283 provides, "A
court of the United States may not grant an injunction to stay
27 proceedings in a State court except as expressly authorized by
Act of Congress, or where necessary in aid of its jurisdiction,
28 or to protect or effectuate its judgments.

**34**

1  has said, "as a practical matter, no defendant in the

2  consolidated federal actions in the present case could

3  reasonably be expected to consummate a settlement of those

4  claims if their claims could be reasserted under state law,

5  whether by states on behalf of the plaintiffs, or by anyone

6  else, seeking recovery of money to be paid to the plaintiffs."

7  *In re Baldwin United Corp.*, 770 F.2d at 336-337.  Allowing other

8  state or federal cases to be brought against the settling

9  Defendants would be counter productive and result in a waste of

10 party and judicial resources that have be invested in settling

11 this matter.  Stratton, as the SGP trustee is acting in the

12 interest of both SGP and the claimants to maximize recovery.

13 The parties have all been given notice and an opportunity to

14 object.

15      In accordance with the best interest of all the parties

16 involved, Stratton's request for a permanent injunction is

17 **GRANTED.**

18      **D..  Attorney's Fees**

19      Attorneys' fees provisions included in proposed class

20 action settlement agreements are, like every other aspect of

21 such agreements, subject to the court's scrutiny for fairness,

22 reasonableness, and adequacy.  *Staton v. Boeing Co.*, 327 F.3d

23 938, 963 (9th Cir. 2003).  "Thus, to avoid abdicating its

24 responsibility to review the agreement for the protection of the

25 class, a district court must carefully assess the reasonableness

26 of a fee amount spelled out in a class action settlement

27 agreement."  *Id.*  If fees are unreasonably high, there is a

28 "likelihood [] that the defendant obtained an economically

**35**

1    beneficial concession with regard to the merits provisions, in

2    the form of lower monetary payments to class members or less

3    injunctive relief for the class than could otherwise have [been]

4    obtained." *Id.* at 964.   However, the court's task in reviewing

5    negotiated fees is different from the court's task in fashioning

6    fee awards from scratch. *Robbins,* 127 Cal. App. 4th at 444.

7    The court is simply to determine whether the negotiated fee is

8    facially fair and reasonable.  *Id.*  This task requires the court

9    to review the settlement agreement as a whole, including the fee

10   award, to ensure that it was fairly and honestly negotiated, is

11   not collusive, and adequately protects the interests of the

12   parties.  *Id.*  Plaintiffs' attorneys have a duty to limit fees

13   to an amount that represents the value of the work done.  *Id.*

14   Therefore, although a negotiated fee may represent a reasoned

15   business decision to settle, a negotiated fee that exceeds a

16   reasonable fee for the attorneys' contribution may not be

17   approved.  *Id.*

18        In calculating attorneys' fees in civil class action suits,

19   the district court has discretion to use either the percentage

20   method or the lodestar/multiplier method.  *Hanlon*, 150 F.3d at

21   1029.[14]  In determining Attorneys' Fees, counsel has used the

22   lodestar method in this case.  "In determining what a reasonable

23   attorney's fee entails, the district court must apply the hybrid

24   approach adopted in *Hensley v. Eckerhart*, 461 U.S. 424, 433 []

25

26        [14]  When a settlement agreement creates a large fund for

27   distribution to a class, as is the case here, courts may use

     either of these two options in determining what is fair and

28   reasonable.

**36**

1  (1983)." *United States v. $12,248 U.S. Currency*, 957 F.2d 1513,
2  1520 (9th Cir. 1992).  "The most useful starting point for
3  determining the amount of a reasonable fee is [1] the number of
4  hours reasonably expended on the litigation [2] multiplied by a
5  reasonable hourly rate." *Sorenson v. Mink*, 239 F.3d 1140, 1145
6  (9th Cir. 2001)(relying upon *Hensley*, 461 U.S. at 433).  The
7  resulting figure is known as the "Lodestar."

8       To determine what qualifies as reasonable attorney's fees,
9  the Ninth Circuit has adopted the twelve Lodestar Factors as
10  "guidelines [and] as appropriate factors to be considered in the
11  balancing process required in a determination of reasonable
12  attorney's fees:"

13       (1)  the time and labor required,

14       (2)  the novelty and difficulty of the questions involved,

15       (3)  the skill requisite to perform the legal service
16            properly,

17       (4)  the preclusion of other employment by the attorney due
18            to acceptance of the case,

19       (5)  the customary fee,

20       (6)  whether the fee is fixed or contingent,

21       (7)  time limitations imposed by the client or the
22            circumstances,

23       (8)  the amount involved and the results obtained,

24       (9)  the experience, reputation, and ability of the
25            attorneys,

26       (10) the "undesirability" of the case,

27       (11) the nature and length of the professional relationship
28            with the client, and

1    (12) awards in similar cases.

2    *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 71 (9th Cir.

3    1975) (suits brought pursuant to 29 U.S.C. §§ 412 and 529)

4    (citing *Johnson*, 488 F.2d 714); *see also $12,248 U.S. Currency*,

5    957 F.2d at 1520 (applying the twelve factors outlined in *Kerr*

6    tothe EAJA).  "[Although] the lodestar determination has emerged

7    as the predominate element of the analysis....the court [can

8    still] make adjustments to the lodestar figure based on the

9    'riskiness' of the lawsuit and the quality of the attorney's

10   work."  *Jordan v. Multnomah Co.*, 815 F.2d 1258, 1262 n.5 (9th

11   Cir. 1986).  In addition, the court may reduce the fee award "if

12   the relief, however significant, is limited in comparison to the

13   scope of the litigation as a whole."  *Hensley*, 461 U.S. at 440.

14        **1.   Beth Maxwell Stratton**

15        Stratton requests the following fees:

16
| Person's Name | Hourly Rate x Total Hours = Total Fees |
|---|---|
| Beth Mexwell Stratton, Chapter 7 Turstee | $175.00 x. 167.85 hours = $28,763.75 |
| Jeanne Bohlae, Secretary/Legal Assistant | $65.00 x 5.60 hours = $364.00 |
| Rochelle Ramirez, Assistant | $50.00 x 3.2 hours = $160.00 |
| Angelo DeSantis, Assistant | $50.00 x 5.10 hours = $255.00 |
| Angela Guthrie, Assistant | $25.00 x. 2.0 hours = $50.00 |
| **TOTAL** | **$29,502.75** |

Stratton requests the following as an Independent Fiduciary of the SGP benefit Plan and Trust for services rendered through April 18, 2006:

| Person's Name | Hourly Rate x Total Hours = Total Fees |
|---|---|
| Beth Maxwell Stratton, Chapter 7 Trustee | $175.00 x 205.95 hours = $ 36041.25 |
| Desiree Terronez, Assistant | $100.00 x. 13.5 hours = $1,350.00 |
| **TOTAL** | **$ 37,391.25 adjusted to $38,752.50** |

Stratton requests the following as compensation for her employees:

| Person's Name | Hourly Rate x Total Hours = Total Fees |
|---|---|
| Rochelle Ramirez, Assistant | $50.00 x 35.5 hours = $1,775.00 |
| Angela Guthrie, Assistant | $25.00 x. 22.0 hours = $550.00 |
| Nithi Jhaveri, Assistant | $50.00 x 26.5 hours = $1,325.00 |
| **TOTAL** | **$3,650.00** |

Lastly, Stratton requests a reimbursement of expenses, the sum of $**6,542.88.**

Stratton requests a total of **$78,448.13** for her services.

### 2.   Trucker Huss Law Firm

To the Trucker Huss law firm, a recognized San Francisco authority in the ERISA field retained by the Trustee/Independent Fiduciary to advise her on ERISA law and legal issued unique thereto, the sum of **$48,746.26.**

39

### 3.    Seng & Stratton's Request for Attorney's Fees

The contract between Stratton and Seng & Stratton is based on a contingency agreement approved by the bankruptcy court on May 15, 2002. (Doc. 113, Seng & Stratton Application for Fees, Filed July 7, 2006.)  Pursuant to the agreement, if recovery is obtained after a lawsuit is filed but before the date the case is first set for trial, Seng and Stratton shall be paid: $75.00/hour for all attorney time spend in the case, $25.00/hour for all legal assistant/paralegal time spent on the case and 15% of the settlement/recovery.  Seng & Stratton request the following in attorneys fees:

| Person's Name | Hourly Rate x Total Hours = Total Fees |
|---|---|
| Michael J. Seng, Partner | $75.00 x 759.60 hours = $56,970.00 |
| Beth Maxwell Stratton, Partner | $75.00 x 333.60 hours = $25,020.00 |
| Research Attorney, Independent Contractor | $75.00 x 2.40 hours = $180.00 |
| Legal Assistant / Paralegal | $25.00 x 31 hours = $775.00 |
| **TOTAL** | **$82,945.00** |

The calculation of the contingency fee is as follows:

| | |
|---|---|
| Settlement with Sunkist | $2,027,376.00 |
| Settlement with Glacier Defendants | $2,000,000.00 |
| Settlement with Former Trustee Defendants | $1,000,000.00 |
| Total Settlement/Recovery | $5,027,376.00 |

| | |
|---|---|
| x 15% | **$754,106.40** |

The total fees requested are: **$837,051.40**.  Seng & Stratton is also requesting an expense reimbursement of **$2,980.80**.

### 4.    McCormick, Barstow, Sheppard, Wayte, & Carruth

Attorney James P. Wagoner requests a total of **$945.00**.  This is based on the following: $225.00 x 4.2 hours = $945.00.

### 5.    Law Office of Alyson A. Berg

Attorney Alyson A. Berg requests a total of **$1,065.00**.

### 6.    Janzen, Tamberi, & Wong, Accountants for Plaintiff

According to the Declaration of Christopher A. Ratzlaff, CPA, accountants for Plaintiff are requesting a total of **$12,600.00,** which is a reasonable value of the services rendered by the accountants for Plaintiff.[15]

All hours calculated are reasonable.  Class counsel spent nearly four years investigating and researching this case, working closely with the DOL legal and investigative staff to determine liability of the Plan and reach a settlement with all respective parties.  reviewing extensive documentation and engaging in negotiations amongst all parties to reach a settlement.  The hourly rates used to calculate the lodestar are also reasonable.  There were no objections to the proposed fees by any party.

The award for Attorneys Fees is **GRANTED**.

---

[15] Stratton has informed the court that Janzen, Tamberi, & Wong may submit further fee applications for fees and costs incurred after April 2006.  The court has not yet received such application.

**41**

**6.   CONCLUSION**

After a careful balance of the aforementioned factors, Stratton's request for approval of the settlement agreement and distribution plan is **GRANTED.**

In accordance with the best interest of all the parties involved, a Stratton's request for a permanent injunction is **GRANTED.**

The following Attorneys Fees are **GRANTED:**

- To Stratton a total of **$78,448.13** for her services as Bankruptcy Trustee and as Independent Fiduciary.
- To the Trucker Huss law firm a total of **$48,746.26.**
- To Seng & Stratton a total of **$840,032.20,** which includes the request for expense reimbursements.
- To McCormick, Barstow, Sheppard, Wayte & Carruth a total of **$945.00** for attorney services rendered.
- To Attorney Alyson A. Berg, a total of **$1,065.00.**
- To Janzen, Tamberi, & Wong, Accountants for Plaintiff a total of **$12,600.00.**

IT IS SO ORDERED.

**Dated:   January 26, 2007**          _____/s/ Oliver W. Wanger_____
b2e55c                                UNITED STATES DISTRICT JUDGE